# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

TALMAN HOWARD,

       Plaintiff,

v.                                                                  Case No. 3:20-cv-1020

BRIGHTWAY INSURANCE, INC.                  **JURY TRIAL REQUESTED**

       Defendant.

_____/

## COMPLAINT

Plaintiff, Talman Howard ("Mr. Howard"), files the following Complaint against Defendant, Brightway Insurance, Inc. ("Brightway"). In support thereof, Mr. Howard alleges as follows:

## PARTIES

1. Mr. Howard is an individual and a citizen of Florida, residing at 1070 Ocean Boulevard, Atlantic Beach, Florida, 32233.

2. Brightway is a Florida for profit corporation with a headquarters and principal place of business located at 3733 West University Boulevard, Suite 100, Jacksonville, FL 32217.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Mr. Howard's claims arise under the laws of the United States, namely the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because Mr. Howard's state law claims asserted herein are so related to his claim

subject to the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), in that Brightway has a headquarters and principal place of business located in this district. Additionally, venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district.

## STATEMENT OF THE CASE

5. On January 6, 2020, Brightway's co-founders, David Miller and Michael Miller, wrongfully terminated Mr. Howard, Brightway's President, because Mr. Howard, then age 56, was "too old to serve as the face of Brightway" and they believed it was necessary for Brightway to project a more youthful vision of the company. Michael Miller personally made these ageist comments to Mr. Howard several weeks before Brightway terminated him. As Brightway's President, Mr. Howard had put his extensive insurance industry experience to work and had transformed Brightway from a quiet, family-owned insurance agency into an industry giant with a vast agency network. These efforts made Brightway a highly attractive candidate for an acquisition. In fact, in view of Mr. Howard's extraordinary leadership transforming Brightway, the Millers began secret discussions in late 2019 with a prospective purchaser. Brightway eventually entered into a letter of intent memorializing a prospective deal that would pay the Millers at least $57 million personally (and potentially much more in view of additional deals contemplated by the letter of intent). However, the Millers believed Mr. Howard's age negatively impacted Brightway's image and reputation and would impede the deal. Therefore, because of his age, the Millers terminated Mr. Howard. Then, to achieve the youthful vision of Brightway they desired, the Millers immediately installed Michael Miller as President, a much younger executive

who was objectively unfit for the position. Thus, this is an action to hold Brightway accountable for age discrimination in violation of the ADEA. In addition, Brightway also committed breach of contract and breach of the implied duty of good faith and fair dealing, all in connection with Mr. Howard's former employment as President.

## FACTUAL BACKGROUND

6. Mr. Howard is a highly experienced and accomplished insurance industry executive. He worked in virtually every capacity possible at Progressive Insurance Company for 25 years. When Mr. Howard joined Progressive in 1986, the company was an agent-centric company on the verge of initiating a strategy to grow into a leading consumer brand. By 2019, Progressive had annual revenue of nearly $39 billion. Mr. Howard left Progressive in 2010 and from this experience, he was acutely aware of the initiatives Progressive implemented to expand its brand, role, and reputation in the insurance industry.

### A. Mr. Howard joined Brightway and began to transform the company.

7. In 2012, Mr. Howard was introduced to Brightway's founders, brothers David Miller and Michael Miller. Mr. Howard recognized that Brightway, at that time, had a tremendous amount in common with Progressive in 1986, and Mr. Howard saw significant potential to grow Brightway. At the time, however, Brightway lacked a true management team as well as robust internal processes. Significantly, the Millers also lacked sufficient leadership and business skills required to maximize Brightway's greatest value. The Millers wanted to position Brightway for a quick sale, but Mr. Howard recognized that the full value of Brightway could not be realized until Brightway made an investment in people, including a senior leadership team, and processes, much as Progressive had done during his tenure there.

8. The Millers hired Mr. Howard who joined Brightway as Chief Marketing Officer in 2012. At the time, Brightway had 104 locations and $257 million in written premiums. The Millers promoted Mr. Howard to President in 2013 after only a year. Thereafter, Mr. Howard was responsible for not only the company's day-to-day operations but also the execution of a broad strategic plan based on his vision of Brightway's potential. In that role, Mr. Howard put his extensive product management, claims, distribution, and leadership experience to work.

9. By 2015, the Millers were so pleased with Mr. Howard's performance that they nominated him as one of Northeast Florida's "Ultimate CEOs," and he subsequently earned this distinction from the *Jacksonville Business Journal* which sponsored the program.

10. Mr. Howard and Brightway finalized a letter agreement dated January 28, 2015 governing Mr. Howard's compensation ("Letter Agreement," attached as **Exhibit A**). In addition to two different types of bonus payments, the Letter Agreement provided that Mr. Howard would be paid 2% of the net proceeds in the event Brightway was sold or partially sold during his employment.

**B.     The Millers refused to provide Mr. Howard with equity in the company.**

11. Despite serving as Brightway's President and being charged with primary responsibility of growing the company and maximizing its value for a potential sale, the Millers refused to provide Mr. Howard with any equity interest in Brightway. This was the case when Mr. Howard initially joined the company in 2012 as well at the time of the Letter Agreement. Thus, Mr. Howard served as Brightway's President under a base salary and an incentive bonus compensation structure that provided far less overall value to him than similarly situated senior executives.

12. In fact, the Millers' refusal to provide any equity interest in the company to its President is uncommon, as providing an equity stake in a company is customary for similar executive leadership roles, especially where a senior executive like Mr. Howard is charged with responsibility for achieving certain goals in anticipation of a full or partial sale. Because the Millers refused to provide any ownership interest, the promise to Mr. Howard of 2% of the net proceeds of any sale was a critical component of the Letter Agreement. In fact, Mr. Howard would not have entered into the Letter Agreement if the Millers had not made this promise. This was the entire point of Mr. Howard remaining with Brightway past 2015.

**C.     Mr. Howard led an extraordinary transformation of Brightway.**

13. Thereafter, Mr. Howard continued to operate Brightway as President. Under his leadership, Mr. Howard transformed Brightway's executive team and implemented processes to streamline operations. This included hiring a Chief Financial Officer, a Vice President of Brand & Communications, a Vice President of Customer Experience, and other senior positions. Each of the senior positions added depth, experience and a needed set of skills and resources in areas that were essential to Brightway's expansion and development. These positions and the critical areas they represented (sound financial management; company branding; consistency and excellence in Brightway's franchisee and customer relationships) – all of which had been lacking at Brightway prior to Mr. Howard's arrival – were indispensable to building Brightway and creating value to prospective purchasers.

14. In addition, Mr. Howard oversaw the implementation of many technology improvements, ranging from improved email systems to telephones, as well as building processes to harvest important data. Mr. Howard led efforts supporting Brightway's brand development, clarifying how Brightway represents itself both to its franchisees and its customers.

15. Mr. Howard led the corporate mission to aggressively grow Brightway over a period of five (5) years so that the business could be made not only financially solvent, but also desirable to buyers. This was the strategic mission of the entire company, and Mr. Howard was entrusted with the implementation of that goal. At each and every benchmark, Mr. Howard not only grew the business, but he also significantly increased the value to each of the principals and to the company itself along the way. Mr. Howard was motivated in these efforts, in large part, due to the promised 2% payment from any sale.

16. Mr. Howard was the catalyst that grew Brightway from a small family-owned and operated agency to a giant in the industry with a vast agency network. Specifically, Mr. Howard's leadership and the systemic, structural and personnel upgrades he implemented directly led to tremendous operational performance and financial growth for Brightway. In 2012, for example, Brightway had $257 million in written premiums and 104 stores. By 2015, Brightway had 117 stores, 268,045 policies and $395 million in written premiums. Under Mr. Howard's leadership, this growth expanded dramatically:

| | | | |
|---|---|---|---|
| 2016: | 134 stores | 298,265 policies | $436.6 million in written premiums |
| 2017: | 151 stores | 334,198 policies | $496.3 million in written premiums |
| 2018: | 178 stores | 370,989 policies | $559.3 million in written premiums |
| 2019: | 215 stores | N/K | est. $650 million in written premiums |

17. During Mr. Howard's tenure as President, the Millers were largely uninvolved with day-to-day business operations at Brightway. Nevertheless, they frequently interjected themselves into the operations in ways that proved harmful to the company. Mr. Howard and Brightway constantly needed to address and overcome numerous distractions and side-issues the Millers manufactured. This included, among other things: several near-crises in the company involving

potential legal claims by Brightway employees arising out of David Miller's mismanagement and poor judgment; the Millers creating a dispute with nearby tenants regarding the parking lot Brightway's employees used; the Millers hiring various relatives and friends for positions in the company despite that these hires were objectively unqualified and ill-equipped to work in an insurance agency; pursuing various far-fetched vanity projects David Miller and Michael Miller would often concoct, such as directing Brightway into the pest control business. Mr. Howard constantly needed to address and resolve these types of matters and many others, which required substantial time, effort and resources, including resources that were otherwise fully deployed running an insurance agency.

18. Despite the constant impediments, side-issues and distractions the Millers regularly placed in Brightway's path, Mr. Howard overcame these issues, and his leadership directly led to Brightway's extraordinary growth, as detailed above.

> **D.  This extraordinary transformation of Brightway led to interest from private equity firms, and in 2019 the Millers met secretly with such a firm to discuss a prospective purchase of Brightway.**

19. Dating to the time of Mr. Howard's Letter Agreement, and even as far back as 2013, the Millers and Mr. Howard had discussed the fact that it was premature to have any contact with any private equity firms until Brightway had reached $10 million in EBITDA. The Millers even set a goal for Mr. Howard to deliver $10 million in EDITDA by 2020; he actually accomplished this a year early, in 2019. To the extent Brightway's value became fully realized by the end of 2019, it was due to Mr. Howard's leadership and extraordinary performance as Brightway's President.

20. In view of Mr. Howard's transformation of Brightway, in late 2019 the Millers began secret discussions with Bronfman LLC, an investment firm that specializes in making equity investments in family and entrepreneur owned businesses.

21. Brightway and Bronfman entered into a letter of intent in December of 2019. Based on a valuation of Brightway of $300 million, Bronfman intended to make a maximum initial investment of $75,000,000, representing a 25% interest in the company. After expenses and fees, the amount that would have been payable to the Millers was in excess of $53,000,000. The parties expressly contemplated an eventual sale of Brightway or an initial public offering to make Brightway into a public company, all of which would pay the Millers substantially more than the initial $53 million expected from this initial deal with Bronfman.

**E. The Millers believed Mr. Howard was too old to be the face of Brightway, and then they fired him because of his age to pave the way for a lucrative deal.**

22. In late October of 2019, Michael Miller asked Mr. Howard to meet with him. In this meeting, Michael Miller expressly stated to Mr. Howard that Mr. Howard was "too old to be the face of the company" at a time when Bronfman was considering a full or partial acquisition of Brightway. Michael Miller also stated that Bronfman needed to see a more youthful vision of Brightway's future. In making those statements, Michael Miller was stating that Mr. Howard's age would be off-putting to Bronfman and threatened a potential lucrative deal with Bronfman. Mr. Howard was 56 at the time.

23. Shortly after entering into the letter of intent memorializing the terms of a lucrative deal, the Millers abruptly terminated Mr. Howard on January 6, 2020. Leslie Wright, Vice President of Brand & Communications and now Brightway's Chief of Staff, prepared a false and inaccurate press release announcing Mr. Howard's "retirement" from Brightway. Chief Financial Officer Bob Taylor came into Mr. Howard's office as Mr. Howard was packing his possessions

and asked Mr. Howard to confirm the accuracy of the false press release Ms. Wright had prepared. Mr. Howard refused to confirm that it was accurate because it was, in fact, blatantly false. Mr. Taylor then told Mr. Howard that Michael Miller was the new "young leader" of Brightway.

24. At the time of his termination, having been told that he was too old to be the face of Brightway and that Bronfman needed to see a youthful vision of the company, Mr. Howard was age 56. On the same day Brightway terminated Mr. Howard, Brightway also announced that Michael Miller, age 40, was being installed as President and CEO.

25. In its haste to remove Mr. Howard and clear the way for Brightway to promote its new youthful image for the perceived benefit of Bronfman, Brightway willfully ignored or was otherwise oblivious to a few key facts – namely, that Michael Miller was objectively unfit to serve as President and CEO due to, among other things, his lack of experience, his lack of accomplishments and, most significantly, his lack of credibility in the insurance industry. In short, Brightway replaced Mr. Howard with a much younger, far less experienced executive.

26. Through his tireless efforts and leadership, Mr. Howard led Brightway to the doorstep of a lucrative sale, and then – at that exact moment – the Millers fired him because of his age. The Millers had hired Mr. Howard and encouraged him to build, grow and transform Brightway. They refused to compensate him with any equity in the company, but they promised to pay him 2% of the net proceeds in the event Brightway was sold or partially sold during his employment. Thereafter, Mr. Howard, at the urging and encouragement of the Millers, worked tirelessly to transform Brightway and maximize the value of the company for a potential sale. Mr. Howard delivered on every promise regarding the transformation of Brightway and successfully positioned Brightway for a lucrative sale as evidenced by the Bronfman letter of intent. Then, at the precise moment of the very first opportunity arising from Mr. Howard's leadership and

transformation of Brightway, the Millers wrongfully terminated Mr. Howard because of his age. The Millers believed his age negatively reflected on Brightway's desired image and reputation – Michael Miller said this to Mr. Howard directly – would be off-putting to Bronfman and would impede a business acquisition that would enrich the Millers financially.

27. Bronfman eventually decided not to proceed with the contemplated transaction due, in part, to the fact that Mr. Howard – the executive who had actually led Brightway's growth and had positioned the company to attract interest from prospective purchasers such as Bronfman – was no longer employed at Brightway. Ironically, the Millers terminated Mr. Howard because of his age, only to blow-up a desired transaction which ultimately left Brightway as a weaker, less valuable company with unsteady and unproven leadership.

## Count I – Age Discrimination ADEA

28. Mr. Howard incorporates by reference the allegations stated in Paragraphs 1 - 27 herein.

29. On May 28, 2020, Mr. Howard filed a Charge of Discrimination with the Equal Employment Opportunity Commission. More than 60 days has passed since Mr. Howard filed his Charge of Discrimination with the EEOC.

30. In late 2019, Michael Miller made express statements to Mr. Howard that Mr. Howard was "too old to be the face of the company" and that Brightway's prospective purchaser, Bronfman, needed to see a more youthful vision of Brightway. Shortly thereafter Brightway terminated Mr. Howard because of his age. Mr. Howard's age played a role in Brightway's decision-making process and had a determinative influence on the outcome.

31. Michael Miller made it clear, via a blatant, offensive comment, that Mr. Howard's age threatened, or potentially undermined, a potential deal with Bronfman. The Millers therefore

needed to terminate Mr. Howard – the "old" face of Brightway – before Bronfman representatives met the Brightway leadership team. Brightway thus terminated Mr. Howard because of his age in the early stages of due diligence, before Bronfman's representatives came to Jacksonville to meet the Brightway leadership team or conduct an extensive review. When that day came, it was important, per Michael Miller's express comments to Mr. Howard, that Bronfman saw youth and vigor, an image they believed Mr. Howard did not promote. Even shortly after his termination, Bob Taylor reinforced Brightway's motivation for abruptly terminating Mr. Howard when he stated that Michael was Brightway's "young leader."

32. To conceal their wrongful termination and the true reason for Mr. Howard's separation from Brightway, the Millers then had Leslie Howard manufacture a false and inaccurate press release announcing Mr. Howard's "retirement" from Brightway, which Mr. Howard disputed. This proffered statement or reason for his separation was untrue and not credible. Mr. Howard certainly had no intention of resigning from the company just before a significant transaction was about to occur for which Mr. Howard had been tirelessly preparing Brightway during the entire term of his employment.

33. Mr. Howard certainly did not retire from Brightway or voluntarily separate his employment, and Brightway never articulated any other reasons for terminating Mr. Howard. Mr. Howard was never subject to any discipline, warnings or counseling of any kind during his tenure at Brightway; to the contrary, up until the point that Michael Miller told him that he was too old to be the face of the company and that Brightway required a more youthful vision, the Millers had routinely praised Mr. Howard, encouraged him, and expressed gratitude for his efforts, which of course had materially benefitted Brightway as well as both David Miller and Michael Miller.

34. On the exact same day it terminated Mr. Howard so as to eliminate the "old" face of the company, Brightway made immediate announcements to promote its new youthful image. It immediately announced that Michael Miller, a younger manager with far less experience in the insurance industry, had replaced Mr. Howard as President. In its rush to remove Mr. Howard and clear the way for Brightway to promote its new image, Brightway willfully ignored or was otherwise oblivious to a few key facts – namely, that Michael Miller was unfit to serve as President and CEO due to, among other things, his lack of experience, his lack of accomplishments and, most significantly, his complete lack of credibility in the insurance industry.

35. Michael Miller's statements that Mr. Howard was "too old to be the face of Brightway" and that Brightway needed to promote a more youthful image, all made shortly before his termination, is direct evidence of age discrimination. This is not merely a reference to Mr. Howard's age; it is a shockingly blatant, derogatory, and offensive statement that directly connected Mr. Howard's age to his job. When he made the statement, Michael was the co-founder and Vice Chairman, a key decision-maker at Brightway who succeeded Mr. Howard as President. Mr. Taylor reiterated this in the moments immediately following Mr. Howard's termination, showing that Brightway's motivation to replace an "old" senior executive with one who promoted youth and vigor was known throughout Brightway's leadership team.

36. Michael Miller's ageist remarks demonstrate that age animus motivated the decision to terminate Mr. Howard's employment. The strength of this evidence is further buttressed by its proximity to his termination: Brightway terminated Mr. Howard shortly after Michael Miller's original statement. The substance, context and timing of the remarks show a discriminatory intent. Lastly, there is a gross disparity between the Mr. Howard's background, qualifications and experience and his significantly younger replacement.

37. Mr. Howard has suffered damages as a result of Brightway's unlawful discriminatory actions, including past and future lost wages and benefits and the costs of bringing this action.

38. Brightway willfully violated Mr. Howard's rights under the ADEA and, as a result, is liable for liquidated damages.

WHEREFORE, Mr. Howard demands judgment against Brightway as follows: (a) past and future loss of wages, bonuses, plus interest, and other employment benefits lost because of Brightway's unlawful termination of Mr. Howard's employment (collectively referred to as "back pay"); (b) retroactive reinstatement to Mr. Howard's former position, with back pay; (c) in the event retroactive reinstatement is not feasible, then in addition to back pay, Mr. Howard demands all earnings, wages, salary, bonuses, and other employment benefits he will lose in the future because of his unlawful termination (hereinafter collectively referred to as "front pay"); (d) liquidated damages equal to the sum of Mr. Howard's back pay plus prejudgment interest on his back pay, under the ADEA, 29 U.S.C. § 626(b); (d) attorneys' fees and expenses, including expert witness fees as allowed by law, all recoverable statutory costs, and all litigation expenses not otherwise expressly allowed by statute; (e) all other legal or equitable relief to which Mr. Howard is entitled as a matter of law or equity; and (f) all such additional relief as the Court deems just and proper.

## Count II
### Breach of the Implied Duty of Good Faith and Fair Dealing (Bonus Calculations)

39. Mr. Howard incorporates by reference the allegations stated in Paragraphs 1- 27 herein.

40. Pursuant to the Letter Agreement, Brightway promised to pay bonuses based on two sets of criteria: (1) 2% of all non-income tax related distributions made by the company; and

(2) an annual year-end bonus if "the year-over-year pre-tax net income results for Brightway Insurance exceed 5% then [Mr. Howard] will receive a year-end bonus equal to 8% of the year over year growth."

41. The Letter Agreement does not expressly describe a specific process for making these calculations, or how Brightway would comply with its obligations under the Letter Agreement to pay the bonuses. However, Brightway owed Mr. Howard a duty to perform these obligations in good faith – meaning, the calculations for the bonuses needed to be made in good faith and could not be rigged or manipulated in order to reduce Mr. Howard's bonus compensation.

42. Brightway did just this, however, by failing to make bonus calculations fairly and in good faith. Specifically, Brightway failed to make bonus payments fairly and in good faith as it relates to the calculation of Mr. Howard's bonus based on the 5% growth calculation. This includes, by way of example: routinely utilizing company revenues for Michael Miller's and David Miller's personal expenses, including meals and other expenses; paying rent on a building Brightway owned; making substantial charitable donations from Brightway as opposed to requiring the co-founders to make such contributions from their distributions or personal assets.

43. Brightway's actions in this regard caused the company to misstate and understate the actual pre-tax net income underlying Mr. Howard's bonus calculation. This, in turn, caused Brightway to calculate a lower bonus for Mr. Howard than he would otherwise be due had Brightway not included improper expenses that lowered net income.

44. The implied duty of good faith and fair dealing also extends to Brightway's obligation to pay Mr. Howard 2% of all non-income tax related distributions made by the company. The Millers refused to provide Mr. Howard with any equity in Brightway, so this portion of the bonus was a mechanism to allow Mr. Howard to obtain a cash payment from Brightway as if he

was an equity owner. Specifically, the intent of this provision was for Mr. Howard to be paid amounts as if he was a realizing 2% ownership interest in Brightway.

45. The Letter Agreement does not expressly describe a specific process for making the 2% calculations, or how Brightway would comply with its obligations under the Letter Agreement in this respect. Brightway owed Mr. Howard a duty to perform these obligations in good faith – meaning, the calculations for this portion of his bonus needed to be made in good faith and could not be rigged or manipulated in order to reduce Mr. Howard's bonus compensation.

46. Brightway, however, misapplied the bonus calculation to underpay Mr. Howard this portion of his bonus. The intent of the Letter Agreement was that Mr. Howard would receive 2% of the non-income tax related distributions made by the company; however, Brightway instead paid Mr. Howard 2% of the total of non-income tax related distributions that Brightway paid to its owners. By way of example, if Brightway paid a non-income tax related distribution to the Millers of $1,000,000, Brightway would pay Mr. Howard $20,000.00, which is 2% of the $1,000,000 distribution paid to the Millers. This, however, is not the correct calculation of the 2% bonus payment. The true intent is that Mr. Howard was entitled to be paid 2% of all non-income tax related distributions made by the company, meaning that if Brightway makes distributions of $1,000,000.00, Mr. Howard would be paid 2% of this amount ($20,000) and the Millers would be paid 98% of this amount ($980,000.00). To the extent Brightway paid the Millers $1,000,000 and Mr. Howard $20,000, the company was actually making distributions in the amount of $1,020,000, and thus Mr. Howard should have been paid 2% of this amount (2% of $1,020,000), not 2% of the $1,000,000 paid to the Millers. By applying the 2% to the distributions paid only to Brightway's owners, as opposed to 2% of the total distributions made by the company, Brightway consistently underpaid Mr. Howard's bonus.

47. The Letter Agreement did not expressly describe Brightway's duties in calculating Mr. Howard's bonuses, and therefore the law implies a duty of good faith and fair dealing on Brightway. The calculations for the bonuses needed to be made in good faith and could not be rigged or manipulated in order to reduce Mr. Howard's bonus compensation.

48. Brightway frustrated Mr. Howard's reasonable expectations that the company would act fairly and in good faith in connection with calculating his bonuses under the Letter Agreement, with respect to both sets of bonus payments described in the Letter Agreement. Brightway's actions therefore constitute breaches of the implied duty of good faith and fair dealing.

49. Mr. Howard has been damaged due to Brightway's breach of the duty of good faith and fair dealing as it applies to the calculation and payment of both sets of bonuses pursuant to the Letter Agreement.

WHEREFORE, Mr. Howard demands judgment against Brightway for all of his losses, costs and damages incurred due to Brightway's breach of the duty of good faith and fair dealing, and for such other relief this Court deems just and proper.

## Count III
**Breach of the Implied Duty of Good Faith and Fair Dealing (2% Sale Payment)**

50. Mr. Howard incorporates by reference the allegations stated in Paragraphs 1- 27 herein.

51. In the Letter Agreement, Brightway promised to pay Mr. Howard 2% of the net proceeds, after taxes and expenses, from any transaction involving Brightway's sale that occurred during his employment. Critically, it was a key underpinning of the Letter Agreement that Mr. Howard's efforts were directed toward preparing Brightway for an eventual sale. The 2% provision was the single largest consideration for Mr. Howard to accept the Letter Agreement and thereafter progress his efforts on behalf of Brightway.

52. Whether Brightway was sold or not during Mr. Howard's tenure as President is not the key issue; rather, the issue is that Mr. Howard had a reasonable expectation that Brightway would not terminate Mr. Howard on an illegal, bad faith basis which would have the effect of denying him the 2% payout. It is the essence of bad faith to wrongfully discharge Mr. Howard which would deny his reasonable expectations under the Letter Agreement regarding the 2% payment.

53. The Letter Agreement did not expressly describe Brightway's duties in preparing itself for a possible sale, and therefore the law implies a duty of good faith and fair dealing on Brightway. This includes a duty not to terminate Mr. Howard on an illegal basis so as to deny him the 2% payment, which would then have the additional impact of enriching the Millers by the amount of the share (believed to be approximately $1,065,600) not being paid to Mr. Howard.

54. In bad faith, the Millers became highly secretive and concealed key meetings and conversations from Mr. Howard, including discussions with J.P. Morgan and Bronfman. By their actions, the Millers frustrated Mr. Howard's reasonable expectations that the company would act fairly and in good faith. They conducted secret meetings and negotiations, and they excluded the senior leadership team (including, significantly, Mr. Howard) who were in the best position to help facilitate such a process. They terminated Mr. Howard because of his age, which would also have the effect of denying him the 2% payment due under the Letter Agreement. Brightway's actions therefore constitute breaches of the implied duty of good faith and fair dealing.

55. Mr. Howard has been damaged due to Brightway's breach of the duty of good faith and fair dealing as it applies to the 2% payout provision.

WHEREFORE, Mr. Howard demands judgment against Brightway for all of his losses, costs and damages incurred due to Brightway's breach of the duty of good faith and fair dealing, and for such other relief this Court deems just and proper.

## Count IV – Breach of Contract

56.     Mr. Howard incorporates by reference the allegations stated in Paragraphs 1 - 27 herein.

57.     Pursuant to the Letter Agreement, Brightway promised to pay Mr. Howard a bonus based on 2% of all non-income tax related distributions made by the company (hereafter, the "2% Provision"). In addition, Mr. Howard was entitled to receive an annual bonus if "the year-over-year pre-tax net income results for Brightway Insurance exceed 5% then you [Mr. Howard] will receive a year-end bonus equal to 8% of the year over year growth"  (hereafter, the "5% Calculation").

58.     Brightway did not pay Mr. Howard bonuses in compliance with these provisions. Specifically, as it relates to the 5% Calculation, Brightway routinely engaged in improper accounting practices and charged many expenses to the company in a false and misleading way so as to reduce the amounts by which Mr. Howard's bonus calculations would be determined.

59.     By substantially reducing the amount of year-over-year pre-tax income which was used as the basis for calculating Mr. Howard's bonus pursuant to the 5% Calculation, Brightway breached the Letter Agreement by not paying Mr. Howard the 5% Calculation bonus based on the actual or true net income results.

60.     In addition, Brightway promised to pay Mr. Howard a bonus based on the 2% Provision.  Specifically, the intent of this provision was for Mr. Howard to be paid amounts as if he was a realizing 2% ownership interest in Brightway.

61. Brightway underpaid Mr. Howard's bonuses pursuant to the 2% Provision.

62. Further, when Brightway paid the 2% bonus payments to Mr. Howard, all such payments were subject to normal employment taxes and withholding. This reduced the total net cash payment to Mr. Howard and is contrary to the language and intent of the Letter Agreement that Mr. Howard be paid a bonus based on 2% of the distributions made by the company. Payments to Mr. Howard should have included additional amounts to pay for employment taxes being withheld on Mr. Howard's bonus, so as to make such payments commensurate with actual distributions being made to Brightway's owners.

63. Brightway breached the Letter Agreement by failing to pay Mr. Howard bonuses in accordance with the 2% Provision.

64. Brightway's actions constitute a breach of the Letter Agreement governing the calculation and payment of bonuses under both the 2% Provision and the 5% Calculation.

65. Mr. Howard has been damaged due to Brightway's breach of the Letter Agreement governing the calculation and payment of bonuses under both the 2% Provision and the 5% Calculation.

WHEREFORE, Mr. Howard demands judgment against Brightway for all of his losses, costs and damages incurred due to Brightway's breach of contract, and for such other relief this Court deems just and proper.

## Jury Demand

Mr. Howard demands a trial by jury on all claims properly triable to a jury.

DATED:  September 11, 2020

       Respectfully submitted,

       **ABEL BEAN LAW P.A.**

       /s/ *Michael A. Abel*
       Michael A. Abel, Esq.
       Florida Bar No. 75078
       Email:  *mabel@abelbeanlaw.com*
       Kathleen Wubker, Esq.
       Florida Bar No. 544213
       Email: *kwubker@abelbeanlaw.com*
       100 N. Laura Street, Suite 501
       Jacksonville, FL 32202
       Phone: 904-944-4100

       *Attorneys for Plaintiff Mr. Talman Howard*